IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE: RESTAURANT ASSOCIATES, L.L.C.
BRIDGEPORT RESTAURANT, L.L.C.

ANTHONY MANCUSO and
ALICE D. MANCUSO,

        Plaintiffs and
        Appellees/Cross-Appellants,

v.                   CIVIL ACTION NO. 1:06CV53

THE MEADOWBROOK MALL COMPANY
LIMITED PARTNERSHIP, an Ohio limited
Partnership, aka Meadowbrook Mall Company,
an Ohio limited partnership, MEADOWBROOK
MALL COMPANY, an Ohio general partnership,
RESTAURANT ASSOCIATES, L.L.C., and
BRIDGEPORT RESTAURANT, L.L.C.,

        Defendants and
          Appellants/Cross-Appellees.

## MEMORANDUM OPINION AND ORDER

This order addresses the issues raised by both parties on their appeal from the Bankruptcy Court's Order of February 17, 2006. For the reasons that follow, the Court **AFFIRMS-IN-PART** the Bankruptcy Court's Order to the extent that court held that the Appellees were on sufficient notice of the covenants at issue in this case, **FINDS** that the repurchase option at the core of this appeal was invalid at its creation under West Virginia's then existing rule against perpetuities and should not be reformed, and

## MEMORANDUM OPINION AND ORDER

**REMANDS** this case for further proceedings in accordance with this Order.

### I.  BACKGROUND

**A.  Factual and Procedural History**

In 1987, the appellants, The Meadowbrook Mall Company ("Meadowbrook"), conveyed to Restaurant Associates L.L.C. ("Restaurant Associates") a tract of commercial property located at the northwest corner of the intersection of New Route 24 and I-79 near the Meadowbrook Mall in Bridgeport, West Virginia.  That property, which is at the center of the dispute in this case, is purportedly subject to covenants ("the covenants") that Meadowbrook placed in the chain of title when it conveyed the land to Restaurant Associates in 1987.  Primarily in dispute is the provision of the covenants giving Meadowbrook the right to repurchase the property in question for a fixed price if the property suffered damage or was destroyed and not restored to its previous condition within eighteen months of the damage or destruction ("the repurchase option").[1]

---

[1] Some of the covenants, including the repurchase option, are located in a document entitled "Real Estate Sales Agreement" executed on January 22, 1987 between Meadowbrook and Bridgeport Restaurant Associates.  This document was never recorded.  Other covenants are found in a document entitled "Criteria for 'Out Parcels,'" which is of record in the Office of the Clerk of the County Commission of Harrison County, West Virginia.  References to both documents are made in the deed between Meadowbrook and Bridgeport Restaurant Associates dated

<u>**MEMORANDUM OPINION AND ORDER**</u>

After having operated a Ponderosa Steakhouse on the property for several years, on July 3, 2003, Restaurant Associates filed for Chapter 11 Bankruptcy in the Bankruptcy Court for the Northern District of West Virginia,[2] and ceased operation of the restaurant sometime in October 2003. On February 24, 2004, during the pendency of the bankruptcy proceedings, Restaurant Associates filed a motion pursuant to 11 U.S.C. § 363 to sell the property free and clear of liens, claims and encumbrances. The Bankruptcy Court granted that motion on March 26, 2004, and on April 2, 2004, Restaurant Associates conveyed the property to the appellees, Anthony Mancuso and Alice D. Mancuso ("the Mancusos"), "subject to any and all exceptions, reservations, restrictions, easements, rights-of-way and conditions as contained in prior deeds of conveyance in this chain of title." The Mancusos paid $931,937.34 for the property.

After obtaining the property, the Mancusos began to demolish the restaurant building. On November 1, 2004, Meadowbrook sent them a cease and desist letter claiming they were bound by certain covenants and in violation of a provision of the covenants requiring that written notice be given to Meadowbrook prior to

---

February 6, 1987.
[2] The Chapter 11 Bankruptcy was converted to a Chapter 7 Bankruptcy on a date not appearing in the record.

demolition. On September 28, 2005, the Mancusos filed a declaratory

judgment action in the Bankruptcy Court seeking a determination

that the covenants did not bind them as bona fide purchasers for

value. Meadowbrook answered, claiming that the covenants were

binding, that the Mancusos had violated them, and that specific

performance of the covenants (including the fixed-price repurchase

option of $337,500.00 that Meadowbrook has the right, but not the

obligation, to exercise) was the proper remedy.

On February 17, 2006, the Bankruptcy Court ruled that the

covenants applied to the Mancusos.[3] Moreover, because it had been

more than eighteen months since the Mancusos had begun demolition

of the structures on the property without restoring the property to

its previous condition, the Bankruptcy Court specifically examined

the fixed-price repurchase option. Upon review, it found that the

repurchase option was unreasonable and that the Mancusos were

"obviously unaware" of it. Therefore, it modified the terms of the

repurchase option, first by extending the period of compliance by

eighteen months and, second, by adjusting the applicable repurchase

price in the event of non-compliance from the fixed price of

---

[3] In addition to the repurchase option, the covenants contain
provisions concerning the use of appropriate signage, the operation of
a family-style restaurant as opposed to a restaurant that specializes
in hamburgers, and several other provisions relating to the operation
and maintenance of the property.

## MEMORANDUM OPINION AND ORDER

$337,500 to the fair market value at the time of the exercise of option. Finally, the Bankruptcy Court found that Meadowbrook had been without notice of the sale of the property from Restaurant Associates to the Mancusos.

In response to the Bankruptcy Court's Order, Meadowbrook filed its notice of appeal to this Court on February 27, 2006, and, on March 8, 2006, the Mancusos filed their notice of cross-appeal. The issues on appeal have been fully briefed and are ripe for review.

The Mancusos challenge the Bankruptcy Court's finding that the covenants are binding upon them and argue that many of the covenants, including the repurchase option, were not properly placed in the chain of title and thus cannot bind them as bona fide purchasers. The Mancusos also contend that Restaurant Associates, as trustee debtor-in-possession, sold the property free and clear of all interests, including the covenants. They further argue that, even if the covenants were properly noticed in the chain of title, and even if the trustee's sale was not free and clear of the covenants, the covenants are invalid because they violate the rule against perpetuities and constitute an unreasonable restraint against alienation. Finally, the Mancusos claim that the

Bankruptcy Court erred when it found that Meadowbrook had no notice of the bankruptcy trustee's sale of the property.

By contrast, Meadowbrook alleges only that the Bankruptcy Court erred in its treatment of the repurchase option, which it contends should have been enforced without modification.

## B.  Stipulations

The parties have stipulated that this was a core proceeding under 28 U.S.C. § 157(b)(2); that the Mancusos bought and modified the property in question; that some of the covenants, including the repurchase option, are not physically on record in any public official's office; and, that the certificate of service accompanying notice of the Restaurant Associate's February 26, 2004 motion to sell free and clear did not include Meadowbrook.

## II.  STANDARD OF REVIEW

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) and reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.  Educational Credit Management Corp. v. Buchanan, 276 B.R. 744, 749 (N.D.W. Va. 2002) (citing In re Deutchman, 192 F.3d 457, 459 (4th Cir. 1999).

## III.  ANALYSIS

The issues presented on appeal are complicated and necessitate a fairly lengthy analysis.  Based on the analysis that follows, the

Court concludes that, under West Virginia law, the record placed the Mancusos on sufficient notice of the covenants, including the unrecorded covenants, such that a reasonable effort would have disclosed their existence and substance.

The Court further concludes that the repurchase option was invalid under West Virginia's then existing rule against perpetuities and should not be reformed under West Virginia's current statutory rule against perpetuities.

With regard to the remaining covenants that deal with the appearance and maintenance of the property, the Court concludes that these are not invalidated by the rule against perpetuities, but that, because the Bankruptcy Court failed to make adequate findings about whether the trustee was able to sell the property free and clear of the covenants, the case must be remanded to determine whether those covenants bind the Mancusos.

## A. Notice under West Virginia Law

In its February 17, 2006 order ruling on the Mancusos' declaratory judgment complaint, the Bankruptcy Court found that "[t]he unrecorded restrictive covenants are a part of the real estate and follow it throughout subsequent purchases. The covenants inure to the benefit of both parties and are consistent with competition within a mall area."

## MEMORANDUM OPINION AND ORDER

In West Virginia, covenants run with the land when they inure to the benefit of the land. Allemong v. Frendzel, 363 S.E.2d 487, 490 (W. Va. 1987); Tennant v. Tennant, 70 S.E. 851, 853 (W. Va. 1911). Specifically, the West Virginia Supreme Court of Appeals has found that repurchase options, such as the one here, run with the land. First Huntington Nat. Bank v. Gideon-Broh Realty Co., 79 S.E.2d 675, 682-83 (W. Va. 1953)(citing West Virginia-Pittsburgh Coal Co. v. Strong, 42 S.E.2d 46, 52 (W. Va. 1947)). In the present case, the repurchase option and other covenants inure to the benefit of the land for the reasons suggested by the Bankruptcy Court. Giving one party control over the aesthetics of the land promotes a uniformity of land use within the mall area that benefits any restaurant operating on the property. See Wallace v. St. Clair, 127 S.E.2d 742, 751 (W. Va. 1962).

Although the covenants at issue run with the land, the Mancusos would not be bound by them unless they were on notice of the covenants at the time of conveyance. W. VA. CODE § 40-1-9 (2004). While the parties stipulate that many of the covenants are not physically on record in any public official's office, they dispute at length whether the Mancusos were nonetheless on notice of their existence.

The deed conveying the property from Restaurant Associates to

-8-

## MEMORANDUM OPINION AND ORDER

the Mancusos subjected the property to "any and all exceptions, reservations, restrictions, easements, rights-of-way and conditions as contained in prior deeds of conveyance in this chain of title." In light of that language, Meadowbrook argues that the Mancusos should have followed the chain of title back to the deed from Meadowbrook to Bridgeport Restaurant Associates, dated February 6, 1987. That deed contains the following provision:

> Grantee, for itself and its grantees, successors and assigns, hereby covenants and agrees to observe, satisfy and be bound by all of the terms, covenants, conditions and restrictions contained in the Real Estate Sales Agreement between Grantor and Grantee, dated January 22, 1987 [containing the repurchase option and other covenants], which is incorporated herein by reference and made a part hereof as if fully rewritten at length.

Meadowbrook claims that, under West Virginia law, the reference to the unrecorded covenants in the deed was sufficient to put the Mancusos on notice of their duty to investigate beyond the documents of record. According to Meadowbrook, because the Mancusos failed to investigate further, they cannot be considered bona fide purchasers to whom the covenants would not apply.

The Mancusos, on the other hand, argue that, pursuant to West Virginia policy, the covenants themselves should have been on record, and that reference to unrecorded covenants in deeds in the chain of title is insufficient for notice purposes. In support of

<u>MEMORANDUM OPINION AND ORDER</u>

their position, they cite West Virginia Code § 40-1-9,[4] and claim

it would be unreasonable to expect a subsequent purchaser to have

notice of the unrecorded covenants.

Both parties rely on West Virginia case law to support their

respective arguments.   The case on which Meadowbrook primarily

relies, <u>Pocahontas Tanning Co. v. St. Lawrence Boom & Mfg. Co.</u>, 60

S.E. 890 (W. Va. 1908), offers the following guidance:

> That which fairly puts a party on inquiry is
> regarded as sufficient notice, if the means of
> knowledge are at hand; and a purchaser, having
> sufficient knowledge to put him on inquiry, or
> being informed of circumstances which ought to
> lead to such inquiry, is deemed to be
> sufficiently notified to deprive him of the
> character of an innocent purchaser.

<u>Id.</u> at Syl. Pt. 3.   Meadowbrook, thus, asserts that the Mancusos

were on notice to inquire further about previous restrictions in

the chain of title, and that the means of knowledge were at hand

for them to do so.   The Bankruptcy Court appears to have reasoned

along these lines as well when it held that "West Virginia law does

not require that the restrictions be placed of record," citing W.

VA. CODE 40-1-8, which provides that a memoranda of leases may be

---

[4]   W. VA. CODE § 40-1-9 (2004) states in pertinent part: "Every such
contract, every deed conveying any such estate or term, and every deed
of gift, or trust deed or mortgage, conveying real estate shall be
void, as to creditors, and subsequent purchasers for valuable
consideration without notice, until and except from the time that it
is duly admitted to record in the county wherein the property embraced
in such contract, deed, trust deed or mortgage may be."

recorded rather than the entire lease itself.[5]

The facts in Pocahontas Tanning, and in the other cases cited by Meadowbrook, are different in important respects from the facts in the present case.  In those cases, the restrictions in dispute were always present in the record.[6]  Here, as noted, the parties

---

[5] W. VA. CODE § 40-1-8 (2004) reads in pertinent part: "A memorandum of lease thus entitled to be recorded shall contain at least the following information with respect to the lease: The name of the lessor and the name of the lessee and the addresses of such parties as set forth in the lease; a reference to the lease, with its date of execution; a description of the leased premises in the form contained in the lease; the term of the lease, with the date of commencement and the date of termination of such term, and if there is a right of extension or renewal, the maximum period for which, or date to which, the lease may be extended, or the number of times or date to which it may be renewed and the date or dates on which such rights of extension or renewal are exercisable.  Such memorandum shall constitute notice of only the information contained therein."

[6] In Pocahontas Tanning, the Pocahontas Tanning Company took a deed to the property in dispute from one McGraw.  60 S.E. at 890. McGraw in turn had taken title to the property in deeds executed by Holt and Mathews, and several deeds executed by the heirs of McCarty (Holt, Mathews and McCarty had together purchased the land from a judicial sale).  Id.  The deed that McGraw took from Holt and Mathews mentioned that the timber on the disputed property was "probably long since cut and removed."  Id.  In addition, while some of the deeds that McGraw secured from McCarty's heirs made no mention of removed timber, a deed conveying the interest of four of McCarty's heirs to McGraw explicitly mentioned that the timber on the property had been removed.  Id.  Additionally, two deeds referencing the missing timber – the deed from four of the heirs of McCarty to McGraw, and the deed from Holt and Mathews to McGraw – were recorded.  Id.  The conveyance from McGraw to Pocahontas Tanning was without reservations, apparently not mentioning the previously conveyed interests in timber.  Id.

The timber interests that had been sold before McGraw obtained title had been passed to St. Lawrence Boom & Manufacturing Co., and the issue before the Court in Pocahontas Tanning concerned which party, Pocahontas Tanning or St. Lawrence Boom & Manufacturing, had the rights to the timber.  The Court's decision ultimately turned on whether Pocahontas Tanning, as a purchaser from McGraw, should have been on notice of those previous conveyances in McGraw's chain of

have stipulated that several of the covenants themselves were never recorded.

Despite the lack of any record notice, there are several West Virginia cases suggesting that purchasers may be charged with searches beyond the record. Last year, in <u>Wolfe v. Alpizar</u>, 637 S.E.2d 623, 628 (W. Va. 2006), for example, the West Virginia Supreme Court of Appeals noted with approval the efforts of a purchaser who, despite finding no restrictions on the record, asked the seller if any such restrictions existed. And earlier, in <u>Eagle Gas Co. v. Doran & Associates, Inc.</u>, 387 S.E.2d 99, 102 (W. Va. 1989), that court held that "when a prospective buyer has reasonable grounds to believe that property may have been conveyed in an instrument not of record, he is obliged to use reasonable diligence to determine whether such previous conveyance exists." <u>Id.</u> Similarly, West Virginia's highest Court has held that "'[w]hen a person cannot obtain a title but by a deed which leads to another fact, whether by description, recital, or otherwise, he will be deemed cognizant of such fact.'" <u>Lenhart v. Zents</u>, 40 S.E.

---

title. The Court found that the references in the recorded deeds should have been sufficient to put McGraw on notice of timber rights of others. <u>Id.</u> at 894. Therefore, the Court found that an inquiry conducted with "common prudence and ordinary diligence" would have put Pocahontas Tanning on notice that the timber rights had been conveyed. <u>Id.</u>

444, 446 (W. Va. 1901) (quoting <u>Coles v. Withers</u>, 1880 WL 6082, *4 (Va. 1880)).

Given the current state of West Virginia law, this Court must determine whether it would have been reasonable for the Mancusos to have inquired further about the unrecorded covenants as part of their duty of "common prudence and ordinary diligence" in investigating their chain of title. The ease with which such an inquiry could have been made suggests that they should have. Although the inquiry might have become more difficult with the passage of time, and perhaps impossible under a different set of facts, the inquiry would have been reasonable given the facts of record here.

Specifically, the 1987 deed from Meadowbrook to Restaurant Associates contained an explicit reference to the document in which the unrecorded covenants were contained. The Mancusos were on notice of the existence of the unrecorded covenants, and taking additional steps to inquire further into the interests that they hoped to acquire would not have been onerous – they simply could have asked Restaurant Associates or Meadowbrook. Therefore, the Court **AFFIRMS** the Bankruptcy Court's finding that the Mancusos were on notice of the unrecorded covenants referred to in the chain of title when they purchased the property from Restaurant Associates.

**B.    The Validity and Applicability of the Covenants**

Although the Court holds that the Mancusos were on notice of all the covenants, it must be noted that the covenants themselves are distinguishable.    Specifically, there are two types of covenants at issue in this case – the repurchase option, and the covenants concerning the maintenance and operation of the property ("the use covenants") – and it is necessary to consider their validity and applicability separately.

**1.    The Repurchase Option**

As noted earlier, the Bankruptcy Court modified the terms of the repurchase option significantly.    On appeal, Meadowbrook challenges that modification while the Mancusos claim that the repurchase option is invalid because it violates West Virginia's rule against perpetuities applicable at the time of its creation, and because it constitutes an unreasonable restraint against alienation.    The repurchase option reads in pertinent part:

> In the event the improvements on [the property] are substantially damaged or destroyed by fire, casualty or any other cause . . . Purchaser shall promptly restore and rebuild the same . . . .    In the event Purchaser (a) fails to commence the restoration of the Property within one . . . year from such occurrence, or (b) fails to complete such restoration within [eighteen months] from the date of such occurrence, Seller shall have the right, but not the

> obligation, to acquire the property from
> Purchaser for the Purchase Price set forth in
> Clause 3 hereof.

The repurchase option itself contains no limitation on its duration.

The rule against perpetuities applicable at the time of the creation of the repurchase option required that "every executory limitation, in order to be valid, shall be so limited that it must necessarily vest, if at all, within a life or lives in being, ten months and twenty-one years thereafter, the period of gestation being allowed only in those cases in which it is a factor." Smith v. VanVoorhis, 296 S.E.2d 851, 853 (W. Va. 1982) (citations and quotation marks omitted). The West Virginia Supreme Court of Appeals has defined "executory limitation" broadly to encompass any limitation of a future interest by deed or will. Id. (citing BLACK'S LAW DICTIONARY 512 (5th ed. 1979)). Specifically, under West Virginia law, a repurchase option, such as the one at issue here, is an interest subject to the rule against perpetuities. First Huntington Nat. Bank v. Gideon-Broh Realty Co., 79 S.E.2d 675, 684 (W. Va. 1953).[7] "The rule against perpetuities, being one of

---

[7] Meadowbrook claims that the rule against perpetuities does not apply to the option to repurchase in question because the option is a vested interest. However, Meadowbrook's claim is contrary to opinions of West Virginia courts holding that repurchase options are not vested interests. See e.g. First Huntington Nat. Bank, 79 S.E.2d at 684.

public   policy,   is   absolute   and   is   arbitrarily   enforced,
notwithstanding   its   enforcement   may   do   violence   to   clearly
expressed intent of the parties to the instrument." <u>Greco v.</u>
<u>Meadow River Coal & Land Co.</u>, 113 S.E.2d 79, 83 (W. Va. 1960).

Applying this rule to the repurchase option at issue here, the
Court finds that the option is an interest which, were it to vest
at all, may vest more remotely than within a life in being plus 21
years from the date of its creation.   Initially, the Court notes
that the business organizations that were parties to the repurchase
option at the time of its creation are not the proper lives by
which to measure time under the rule. <u>Cattail Associates, Inc. v.</u>
<u>Sass</u>, 907 A.2d 828, 840 (Md. Ct. Spec. App. 2006) (citing <u>Fitchie</u>
<u>v. Brown</u>, 211 U.S. 321, 334 (1908)).   When business organizations
are parties to the transactions, courts disregard the "lives in
being" element of the rule, and adopt a strict 21 year limit.
<u>Symphony Space, Inc. v. Pergola Properties, Inc.</u>, 669 N.E.2d 799,
806 (N.Y. 1996).   Even if business organizations were not involved,
however, it is clear from its terms that the repurchase option
contains no definable outer limit within which it must vest.
Accordingly, the Court concludes that the repurchase option is
invalid under West Virginia law applicable in 1987. <u>See Starcher</u>
<u>Bros. v. Duty</u>, 56 S.E. 524, 526 (W. Va. 1907).

The Court's analysis does not end with a survey of the state

of the rule under West Virginia's common law in 1987, however.   In

1992, West Virginia adopted the Uniform Statutory Rule Against

Perpetuities ("USRAP"), which contains the following provision:

> If a nonvested property interest or a power of
> appointment was created before the effective
> date of this article and is determined in a
> judicial proceeding, commenced on or after the
> effective date of this article, to violate
> this state's rule against perpetuities as that
> rule existed before the effective date of this
> article, a court upon the petition of an
> interested person may reform the disposition
> in the manner that most closely approximates
> the    transferor's    manifested    plan    of
> distribution and is within the limits of the
> rule against perpetuities applicable when the
> nonvested    property    interest    or    power    of
> appointment was created

W. VA. CODE § 36-1A-5(b) (2005).   Meadowbrook seeks application of

this provision to reform the repurchase option. [8]

Reformation under the USRAP is an inherently equitable action.

USRAP § 5 cmt. (amended 1990); 66 AM. JUR. 2D <u>Reformation of</u>

<u>Instruments</u> § 3 (2007).   Thus, even though this Court has the power

---

[8] Though there are few cases discussing the exact procedure for
petitioning a court to reform an invalid interest under the USRAP, the
plain language of the provision seems to allow this Court to both
invalidate and reform a particular interest upon an interested person's
request without more procedural formality.   <u>See Argus Real Estate, Inc.</u>
<u>v. E-470 Public Highway Authority</u>, 97 P.3d 215, 219 (Colo. Ct. App. 2003)
("The USRAP anticipates that '[t]he equitable power to reform would
typically be exercised in the same judicial proceeding in which the
invalidity is determined.'" (quoting USRAP § 5 cmt. (amended 1990))
(internal quotation marks and alteration added).

to reform the repurchase option and bring it within the common law lives in being plus twenty-one year period applicable in 1987, it first must determine whether the equities warrant doing so.

The Bankruptcy Court acted in equity to reform the repurchase option, but it did not do so in order to bring the option into conformity with the rule against perpetuities. Rather, the Bankruptcy Court acted out of a more general equitable intent, and rewrote the option entirely.

In determining whether that result was an appropriate exercise of equity under West Virginia law, helpful guidance is found in the discussion of the effect of irregularities in the recording process in In re Williams, 584 S.E.2d 922 (W. Va. 2003). There, in discussing the effects of a defective acknowledgment, the West Virginia Supreme Court of Appeals directed courts to consider the benefits and harms flowing from either enforcing or voiding the written instrument. Id. at 928.

Here, Meadowbrook asks the Court to reform the repurchase option and to strictly enforce the newly reformed option on terms significantly favorable to it. Were this Court to do as Meadowbrook suggests, the Mancusos would receive only $337,500 pursuant to the fixed price set forth in the covenants despite having paid $975,000 to the bankruptcy trustee in 2004. Neither

the harm flowing to the Mancusos – their loss of over $600,000 – nor the benefit flowing to Meadowbrook – its right to purchase property at a fraction of its fair market value – would be equitable. Thus, equitable considerations weigh against reformation and the Court, therefore, declines to reform the repurchase option, which remains invalid under the rule against perpetuities and does not bind the Mancusos.

### 2. The Use Covenants

Although the parties' briefs focus primarily on the repurchase option, the Mancusos claim that the use covenants also are invalid under the rule against perpetuities and constitute an unreasonable restraint against alienation. The use covenants, however, differ in important respects from the repurchase option. While the repurchase option is a non-vested future interest, the use covenants are vested interests not subject to the rule against perpetuities. See Greco v. Meadow River Coal & Land Co., 113 S.E.2d 79, 84-85 (W. Va. 1960) (restrictive covenants vest in the grantee and are not subject to the rule against perpetuities); Hennen v. Deveny, 77 S.E. 142, 142 (W. Va. 1913) (restrictive covenant of unlimited duration becomes "appurtenant to the land and passes with it."). See also Malone v. Guynes, 2007 WL 521939 (Ark. Ct. App. 2007) (restrictive covenants vest immediately and are not

subject to the rule against perpetuities); <u>Energizer, LLC v.</u>
<u>Premium Properties Ltd. Partnership</u>, 2007 WL 448010 (Wis. Ct. App.
2007) (use restraints do not implicate the rule against
perpetuities); <u>Tivoli Stock LLC v. New York City Dept. of Housing</u>
<u>Preservation and Development</u>, 2006 WL 3751468, *8 (N.Y. Sup. Ct.
2006) (restrictive covenants do not violate the rule against
perpetuities; <u>Schafer v. Deszcz</u>, 698 N.E.2d 60, 62 (Ohio Ct. App.
1997) (covenants that run with the land are vested interests not
subject to the rule against perpetuities); <u>Jones v. Herald</u>, 881
P.2d 116, 118 (Okla. Civ. App. 1994) (restrictive covenant are
vested interests not subject to the rule against perpetuities); <u>Elm</u>
<u>Hill Holmes, Inc. v. Jessie</u>, 857 S.W.2d 566, 570 (Tenn. Ct. App.
1993) (the rule against perpetuities is not applicable to
restrictive covenants); <u>Henderson v. Mills</u>, 373 N.W.2d 497, 505
(Iowa 1985) (rule against perpetuities does not apply to
restrictions on land use) (citing 20 AM. JUR. 2D <u>Covenants,</u>
<u>Conditions, and Restrictions</u> § 183 (1965)); <u>McKinnon v. Neugent</u>,
167 S.E.2d 593, 594 (Ga. 1969) (rule against perpetuities does not
apply to covenants restricting the use of the land); <u>Cornett v.</u>
<u>City of Houston</u>, 404 S.W.2d 602, 605 (Tex. Civ. App. 1966) (rule
against perpetuities applies only to remotely vesting estates and
not to restrictive covenants); <u>Harris v. Pease</u>, 1948 WL 713, *2-3

(Conn. Super. Ct. 1948) (restrictive covenants are not governed by the same laws governing the restriction of alienation); <u>Kilpatrick v. Twin States Realty Co.</u>, 10 So.2d 447, 449 (Miss. 1942) (restrictive covenants do not violate the rule against perpetuities).

Moreover, West Virginia has long accepted the validity of restrictive covenants and has held that they do not violate West Virginia's policy against the restriction of alienation. In <u>Wallace v. St. Clair</u>, 127 S.E.2d 742 (W. Va. 1962), the Supreme Court of Appeals held:

> Zoning regulations and building restrictions imposed by municipalities are an accepted part of modern community life. Similar ends are frequently accomplished in developments of residential areas, as in the present case, by the voluntary, contractual acts of property owners by means of restrictive covenants . . . . Such restrictive covenants are not against public policy. . . . They do not place a restraint upon alienation. Their purpose is lawful and laudable. If the restrictions are reasonable in nature and purpose, they are upheld. [They] are designed to be for the benefit of every lot or parcel of land in the area affected by the restriction. Each lot or parcel is not merely burdened by a restriction but it is also clothed with the benefit which is enforceable against every other lot or parcel. The burdens and benefits are reciprocal.

<u>Id.</u> at 751 (citations omitted).

As discussed previously, the use covenants are reasonable in

light of the nature of the land in question. Accordingly, they do not violate the rule against perpetuities and do not constitute unreasonable restraints upon alienation under West Virginia law.

The Mancusos contend, however, that, even if the use covenants are interests in the land, they nevertheless are inapplicable under the Bankruptcy Code.

## C. The Bankruptcy Court's Order Selling the Property Free and Clear

Under 11 U.S.C. § 363(f) of the Bankruptcy Code, a bankruptcy trustee – in this case Restaurant Associates as debtor-in-possession – has the power to sell property of the bankruptcy estate free and clear of any interest:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(2004 & Supp. 2006). Specifically, the Mancusos contend that §§ 363(f)(1), (4) & (5) are relevant to this case and permit the trustee to sell free and clear of any interests,

including the use covenants.[9]

> 1. **Section 363(f)(1) does not permit the sale of the property free and clear of the covenants.**

The Mancusos argue that the trustee could sell free and clear of the use covenants because applicable nonbankruptcy law, specifically the law of eminent domain, would permit such a sale. Meadowbrook responds that eminent domain is not specifically applicable because no authorized body has initiated eminent domain proceedings in this case. Moreover, it contends that eminent domain is not generally applicable under § 363(f)(1) because, were that the case, the section would be rendered a nullity. The specter of eminent domain is always present, Meadowbrook argues, and thus would always justify a trustee's sale.

Meadowbrook's analysis is more persuasive. This case simply does not arise in a context where eminent domain is applicable. No authorized body has initiated eminent domain proceedings; moreover, if eminent domain were generally applicable, Meadowbrook correctly notes that it would overwhelm the narrow language of § 363(f)(1),

---

[9] Although the Bankruptcy Court cited § 363(f) for authority in ordering the sale of the property in question, the record on appeal does not disclose the specific provision of § 363(f) on which the Bankruptcy Court relied. Section 363(f) is applicable to the use covenants because "interest" is defined by state property law, In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988), cert. denied, Universal Cooperatives, Inc. v. FCX, Inc., 489 U.S. 1011 (1989), and, as discussed previously, the use covenants are interests under West Virginia law. Wallace v. St. Clair, 127 S.E.2d at 755.

**MEMORANDUM OPINION AND ORDER**

which permits trustees to sell free and clear "only if" specific conditions are met. If § 363(f)(1) contemplated the use of eminent domain as a relevant type of "applicable nonbankruptcy law," there would be no need for the limiting "only if" language.

Significantly, in In re Haskell L.P., 321 B.R. 1 (Bankr. D. Mass. 2005), the Bankruptcy Court for the District of Massachusetts considered the same eminent domain arguments under § 363(f)(5), which permits a sale free and clear if the trustee could be compelled, in law or equity, to accept money as satisfaction for the interest. In rejecting those arguments, the bankruptcy court found that the possibility that eminent domain could be applicable was not enough to justify a sale under § 363(f)'s provisions. Id. at *9. That reasoning applies to the facts in this case. The court concludes that the mere possibility of eminent domain does not authorize a trustee's sale free and clear under the narrow conditions listed in § 363(f).

**2.    Under § 363(f)(4), the covenants are not in bona fide dispute.**

Under § 363(f)(4), the trustee can sell property free and clear of the covenants if they are in bona fide dispute. The Mancusos, who have the burden to prove the existence of a bona fide dispute, see In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 828 (N.D. Ill. 1993), contend that such a dispute over the property

does exists.  Meadowbrook, by contrast, contends that the bona fide dispute must have been present at the time of the trustee's sale and must have specifically concerned the validity of the debt, not tangential issues of covenants between third parties.  Therefore, Meadowbrook argues, the dispute in this case is not the type of dispute contemplated by § 363(f)(4).

Meadowbrook is correct that the dispute contemplated by § 363(f)(4) is the validity of the debt, In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995) (citations and quotation marks omitted), and not tangential disputes, such as the applicability of the covenants, that are in issue here.  When the alleged dispute concerns the rights of third parties and not the debtor, bankruptcy courts should use § 363(f)(4) with caution.  State of Mo. v. U.S. Bankruptcy Court for E. D. of Arkansas, 647 F.2d 768, 778 (8th Cir. 1981), cert. denied, 454 U.S. 1162 (1982).

The Mancusos concede that, under § 363(f)(4), the dispute must be present at the time of the trustee's sale.  Despite the fact that the dispute here arose after the trustee's sale, they assert that there was in fact an "unknown dispute" concerning the covenants at the time of the sale.  That the dispute was unknown, they contend, does not make it any less a bona fide dispute. Regardless of whether the dispute was known or unknown to the

Mancusos at the time of the trustee's sale, however, it is simply not the type of dispute contemplated by § 363(f)(4). Accordingly, the trustee could not have sold Restaurant Associate's property free and clear of the covenants under § 363(f)(4).

3.   **Further factual findings are necessary to determine whether Meadowbrook could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for the covenants in lieu of their specific performance.**

In their final argument under § 363(f), the Mancusos contend that, because Meadowbrook could have been compelled to accept a money satisfaction in lieu of specific performance of the covenants, the trustee could have sold the property free and clear of those covenants.  The Mancusos rely on Robinson v. Edgell, 49 S.E. 1027 (W. Va. 1927), for the proposition that, under West Virginia law, a landowner who benefits from restrictive covenants may be forced to accept money as compensation for violations of those covenants, rather than having those covenants specifically enforced in equity.

In its response to this argument, Meadowbrook attempts to narrow the proposition for which Robinson stands by suggesting that in West Virginia a landowner is forced to forego equitable enforcement of the restrictive covenants only when the characteristics of the property and surrounding land have changed

<u>**MEMORANDUM OPINION AND ORDER**</u>

significantly enough so that enforcement of the restrictive covenants would be inequitable. Meadowbrook notes that the Mancusos have not established that the property and land in question have changed sufficiently to compel Meadowbrook to forego equitable enforcement of the purchase option for money satisfaction.[10]

Meadowbrook's reading of <u>Robinson</u> is correct. Although the parties put significant emphasis in their briefs on this issue, the record, unfortunately, fails to address whether Meadowbrook could have been compelled, at the time of the trustee's sale, to accept money satisfaction for the covenants. The Bankruptcy Court failed to analyze the issue under § 363(f)(5) when it ordered the sale, and never determined whether the character of the land around the subject property had changed so as to make enforcement of the restrictive covenants inequitable under West Virginia law.

---

[10] Meadowbrook cites decisions from bankruptcy courts in other states that, it argues, stand for the proposition that restrictive covenants are not the sort of interests for which a trustee can compel the interest holder to accept money satisfaction. The cases on which Meadowbrook relies, however, are distinguishable because the restrictive covenants at issue in those cases were found to be outside the scope of § 363(f)(5) for reasons having to do with underlying state law, <u>In re 523 E. Fifth Street Hous. Preserv. Dev't Fund Corp.</u>, 79 B.R. 568, 576 (Bankr. S.D.N.Y. 1987), or the terms of the specific covenants in question, <u>Gouveia v. Tazbir</u>, 37 F.3d 295 (7th Cir. 1994). As mentioned previously, this Court will look to state law for the property law applicable in this case. <u>But see In re WBQ Partnership</u>, 189 B.R. 97, 106 (Bankr. E.D. Va. 1995) (finding § 363(f)(5) inapplicable to restrictive covenants without reference to specific state law governing monetary versus equitable satisfaction).

## MEMORANDUM OPINION AND ORDER

The Bankruptcy Court, however, did note that, under §
363(f)(5), in order for the trustee's sale to have been free and
clear of the covenants, Meadowbrook must have had notice of that
sale.  11 U.S.C § 363(b)(1) (2004 & Supp. 2006).  The parties have
stipulated that the certificate of service accompanying the notice
of Restaurant Associate's February 26, 2004 motion to sell free and
clear did not include Meadowbrook; nevertheless, the Mancusos
contend that Meadowbrook had actual notice of the bankruptcy
proceedings and sale.  While the Bankruptcy Court found that
Meadowbrook did not have notice because it was not listed on the
certificate of service, it made no findings as to whether
Meadowbrook had actual notice of the sale.

Remand to the Bankruptcy Court is proper when relevant facts
are unclear from the record.  See In re Muncrief, 900 F.2d 1220,
1224 (8th Cir.1990).  Here, remand is required to permit the
Bankruptcy Court to determine whether the character of the subject
property and surrounding land has changed sufficiently so that the
trustee could have sold the property free and clear of the use
covenants under 363(f)(5), and, if so, whether Meadowbrook had
actual notice of the sale of the property.[11]

---

[11] Naturally, any review of the trustee's sale under § 363(f) this far
after the completion of the sale will not affect the actual sale of the
property or any of the rights or interests of the debtor.  The Bankruptcy
Court has the power to review and modify the sale solely for the narrow

### IV. CONCLUSION

The Court finds as follows:

(1) The repurchase option listed in the covenants is invalid under West Virginia's then existing rule against perpetuities;

(2) Equity and West Virginia policy weigh against reformation of the repurchase option under the USRAP;

(3) The repurchase option does not bind the Mancusos;

(4) The use covenants are valid under West Virginia law; and

(5) A determination of the binding effect of the use covenants depends on facts not presently found on the record.

Accordingly, the Court **AFFIRMS-IN-PART** the February 17, 2006 order of the Bankruptcy Court and **REMANDS** this case to the Bankruptcy Court for further proceedings in accordance with this Order.

It is so **ORDERED**.

---

purpose of determining if, under § 363(f)(5), the sale was or should have been free and clear of the use covenants.  See In re Metzger, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) ("The Court has jurisdiction to review and modify or set aside its own orders.") (citing Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131 (1937)).

## MEMORANDUM OPINION AND ORDER

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: March 28, 2007.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE